## STEELE v. KELLOGG.

1. FRAUD—SUBSCRIPTION TO CORPORATE STOCK—REPRESENTATIONS OF THIRD PERSON.

    While statements of fact, made by a person who was not acting for the defendant or associated with him as principal, are not a proper subject of comment in the opening statement of counsel, under a declaration for fraud of the defendant in inducing plaintiff to subscribe for corporate stock, such reference was not error when the statements referred to were shown on cross-examination by the defendant's counsel, in sustaining his theory of the defense.

2. SAME—SUBJECT-MATTER.

    That the alleged representations related to a business owned by one who was not interested in the venture, would not affect plaintiff's right to recover, where the corporation to which he subscribed projected the taking over of a part of such business, to which the representations related, and the defendant was to profit by the transaction.

3. SAME—INTENT.
    Proof of oral representations similar in character to those
    alleged in the pleadings, made by defendant to third parties,
    was competent as having a tendency to show fraudulent in-
    tent.

4. SAME—EVIDENCE.
    A letter written after plaintiff had concluded the agreement,
    having a tendency to negative the defense that the alleged
    untrue statements were inadvertently made, was admissible.

5. SAME—VALUE—OPINION EVIDENCE.
    Opinion evidence was properly received to show the value of
    corporate stock that had no market value, and was not the
    subject of sale.

6. SAME—RELIANCE ON REPRESENTATIONS.
    Where it was claimed that defendant wrote a letter to an in-
    termediary with whom plaintiff dealt, and that plaintiff read
    the letter and acted in reliance on it, the question whether
    plaintiff had agreed to subscribe before he saw the letter was
    a material issue.

7. SAME.
    Whether or not defendant understood that the plaintiff had
    already subscribed for the stock was material in determining
    his intent in writing the letter which contained the false
    statements.

8. EVIDENCE—CORRESPONDENCE.
    A witness was properly allowed to explain what he meant by
    stating in a letter that he had agreed with plaintiff relative
    to the subscription.

9. DAMAGES—FRAUD AND DECEIT—STOCK.
    Instructions to the jury which permitted the jury to find, as
    damages, the difference between the actual value of the stock
    and the value it would have had if it had been as represented,
    not exceeding the amount paid for it, were not prejudicial to
    defendant's rights.

10. SAME—INTEREST.
    Where money is obtained by fraud and deceit interest may be
    added as compensation.

11. NEW TRIAL—WEIGHT OF EVIDENCE.
    The denial of a new trial is *held* to be sufficiently supported by
    the weight of the evidence.

Error to Calhoun; North, J.   Submitted April 15, 1910.   (Docket No. 69.)   Decided November 11, 1910.

Case by William H. Steele against John H. Kellogg and Will K. Kellogg for fraud and deceit. Judgment for plaintiff; defendant Will K. Kellogg brings error. Affirmed.

*George W. Mechem* and *Henry B. Graves*, for appellant.

*Arthur B. Williams* and *Sam A. Mitchell*, for appellee.

OSTRANDER, J.   Plaintiff filed his declaration June 5, 1908, against John H. Kellogg and Will K. Kellogg, defendants, alleging in the first two counts of the declaration that he was induced to purchase the shares of stock in a corporation by the fraud and deceit of both defendants, and, in the last two counts, that said fraud and deceit was practiced by the defendant Will K. Kellogg. The plea was the general issue. At the trial, at which the first two counts of the declaration were withdrawn, the plaintiff recovered a verdict and judgment against the defendant Will K. Kellogg for $9,442.27. There was a motion for a new trial, which was denied. It is alleged in the declaration, and these are the essential allegations in both the third and fourth counts thereof: that the defendant Will K. Kellogg, prior to October 22, 1906, being an owner of certain so-called proprietary food preparations known as Peptol, etc., etc., and anxious and desirous of disposing of said proprietary food preparations and formulas for making the same, had negotiations with one Charles D. Bolin to secure either the sale of said food preparations to said Bolin or to secure his co-operation in bringing about a sale: that said Bolin was entirely unacquainted with the nature and character of said food preparations and what had been accomplished previous thereto in reference to the sale of them, except as he was

informed and advised in reference thereto by said defend
ant, and said Bolin had no means of information, and no
information was given to him with reference to the
preparations, salability, and what had previously been
accomplished in the sale of them, except as he was ad-
vised and informed by the said defendant: that such
negotiations were had that the said Will K. Kellogg
claimed to have an option from John H. Kellogg so that
the preparations and the formulas for making the same
could be purchased for the sum of $20,000 in cash, and
thereafter negotiations were had with the said Bolin by
the said Will K. Kellogg to the end that said Bolin was
to procure stock subscriptions to be paid for in cash among
his business acquaintances and friends in the city of St.
Louis, and a corporation was to be formed with a capital
stock of $100,000, to which corporation the right to manu-
facture said food preparations and the formulas was to be
transferred or to be caused to be transferred by said Will
K. Kellogg or John H. Kellogg, or both of them, upon
the payment of the said sum of $20,000.

"That said Will K. Kellogg, in order to bring about
the sale of the right to manufacture said food products
and the formulæ for the manufacture of the same, as
aforesaid, in which food products and the right to manu-
facture the same the said Will K. Kellogg had, to wit, a
one-quarter interest, entered into a scheme to bring about
such sale, and to that end and purpose misrepresented the
facts and deceived the plaintiff herein in reference to said
food products and their salability, and in reference to
what had been previously done and accomplished in ref-
erence to the sale thereof. That the said Will K. Kellogg,
in carrying out said scheme, represented and stated ver-
bally to the said Charles D. Bolin, at the said city of Bat-
tle Creek and elsewhere, that the sales upon Peptol, one
of said food preparations, as carried on at the said city of
Battle Creek by the said John H. Kellogg or by said Sanitas
Nut Food Company, Limited, or by said Will K. Kellogg,
or by some or all of them, had earned a net profit of from
12 to 15 per cent. per year on $100,000. And in further
representing to said plaintiff what had previously been
accomplished in reference to the sale of said Peptol, and

that on such sales there had been earned a net profit of from 12 to 15 per cent. per year on $100,000 (meaning thereby during the year then next preceding the date of the letter next hereinafter referred to) under date of September 27, 1906, at said city of Battle Creek, wrote to the said Charles D. Bolin a letter, which letter was in words and figures as follows, to wit:

"Sept. 27, 1906.

"CHAS. D. BOLIN,

"Louisville, Ky.

"*Dear Friend:* I have yours concerning Peptol. I do not want to appear obstinate or stubborn, but after giving the matter considerable thought, I do not feel inclined to donate any of my $15,-000 block of Peptol stock to Mr. Steele, and if the deal is to fall through for the reason that I will not comply with Mr. Steele's demand, I think we will have to let it go. I have an option from the Dr. for his Peptol business. If obliged to do so, I can pay the Dr. October seventh for his option, $20,000 worth of Corn Flake stock, two for one. I will do as much for Dr. Davis as either yourself or Mr. Clague, but I have the impression that Mr. Steele should be satisfied with what you have already offered him. If the deal is to be called off, kindly wire me promptly on receipt of this, at my expense. Papers are already being executed by the attorneys, but we can go ahead and organize it with Battle Creek people, without the assistance of a large amount of capital. The business which is already established is paying 12 to 15 per cent. on $100,000. If necessary to do so, I can handle the deal on my own account, without the assistance of any one; however, would like to have you in it, as I am confident it will be a money maker. With kind regards and best wishes, I am,

"Very truly yours,

" W. K. KELLOGG."

"And in which letter above referred to the said defendant, Will K. Kellogg, among other things, reiterated the aforesaid statements and representations in reference to the sales upon Peptol and the earnings thereof, previous thereto, by the use of the following language:

" 'The business which is already established' is paying 12 to 15 per cent. on $100,000.'

"And the said Will K. Kellogg in further carrying out the said scheme at said city of Battle Creek wrote to the said Charles D. Bolin a letter under date of October 1, 1906, which letter was in words and figures as follows, to wit:

"'October 1, 1906.
"'Mr. CHARLES D. BOLIN,
        "'St. Louis, Mo.

"'*Dear Mr. Bolin:* I have just had a long distance message from Stanley Clague. He tells me that the Peptol matter is in the air and that if I do not submit to the assessment of a thousand dollars made on me for the benefit of Mr. Steele by next Tuesday that the whole thing is off, so far as you are concerned. All that I have to say, Mr. Bolin, is that I shall be satisfied with your decision if it is to be that way. Peptol is already making good money. I have an option from J. H. K. which I can manage myself and the company is practically organized; and to meet the attorney this afternoon at three to finish and complete the papers, and we are all ready to go ahead and do business. I at the present time own one-quarter interest in Peptol. I can readily take up on Dr. Kellogg's option by giving some of my Corn Flake stock as collateral to note and in case I do this and become the entire owner of all that pertains to Pan-Peptogen, Peptol and Maltol I am sure that my interest would be worth at least $50,000. Peptol is better than it has ever been before, we are getting good results and are getting good repeat orders. Last night about half-past eight, while at my home, I had a telephone call. The party gave his name as Calvert. He said he was a postal clerk at the office, and called me up about a special delivery letter he had just received from St. Louis, Mr. Dodd. I asked to have the letter sent up. Remembering the young man as one to whom I had given some Peptol to try, I asked him how he was getting along. Mr. Frank Calvert stated that he had gained sixteen pounds since he began using Peptol and that his wife had also gained. Calvert had always been one of the lean, long and lank kind, and never before in his life had he been able to make any gain; in fact, for some years he had been gradually losing. If Peptol will do this for Calvert and wife, it will do the same thing for hundreds of others. Unless I hear from you by telegram Tuesday night, I shall consider the deal is off, and so far as you and I are concerned, I am at perfect liberty to go ahead and operate Peptol as I see fit. I am sending this letter special delivery to insure its reaching you in time for the telegram. I shall not be in the least offended if you decide to throw the proposition down.

        "'Yours very truly,
            "'W. K. KELLOGG.'

"And in which letter last above referred to the said Will K. Kellogg, among other things, reiterated the aforesaid statements and representations in reference to the sales upon Peptol and the earnings thereof, previous thereto, by the use of the following language: 'Peptol is

already making good money' (meaning thereby 12 to 15 per cent. on $100,000 during the year previous thereto). That the said representations and statements made verbally by the defendant herein as above stated, and as contained in the letters written by him to the said Bolin as aforesaid, were made in accordance with, and in carrying out, the scheme of the defendant as aforesaid, and were made for the purpose of having such representations and statements used by the said Bolin in soliciting stock subscriptions for such proposed corporation; and the said Will K. Kellogg, at the time of making such representations and at the time of writing such letters and thereafter, well knew that such representations and statements so made by him as aforesaid were to be used by the said Bolin in soliciting stock subscriptions for such proposed corporation, and such representations were made by said Will K. Kellogg, he having knowledge in reference thereto superior to that of said Bolin and of this plaintiff, and superior to the knowledge of this plaintiff when he subscribed for the stock herein mentioned and paid the money herein referred to, said Will K. Kellogg, then and there, knowing such representations to be false and untrue, and said Will K. Kellogg made such representations for the purpose of deceiving and defrauding this plaintiff and any others who were to be solicited to buy the capital stock of said corporation as herein set forth."

It is alleged that Bolin related and restated to plaintiff and others whom he solicited to purchase stock in the proposed corporation the statements made by the said Will K. Kellogg in reference to the earnings from said Peptol, stated that it was proposed to form a corporation with a capital stock of $100,000 to take over the manufacture of said food preparations as aforesaid, and exhibited to plaintiff and others the said letters which are above set out; that the plaintiff read the letters, and, having no other means of information, believed the statements therein and those given to him by the said Bolin in reference to the earnings from Peptol, and, relying solely thereon, subscribed for capital stock of the Peptol Company; that the said statements and representations of said Will K. Kellogg so made verbally and in and by the said letters were untrue and false, in that the earnings upon the manufact-

ure and sale of Peptol previous to September 27, 1906, had not been from 12 to 15 per cent. per year upon $100,000, and the business which had been already established was not paying 12 to 15 per cent. on $100,000, but, on the contrary, the net earnings upon the manufacture and sale of said Peptol had been limited, if they were anything at all, and the said Peptol was not then already making good money as alleged.

Upon the trial the plaintiff gave the following testimony:

"*Q.* Now, I want you to tell the jury what led and induced you and what you relied upon in making this investment of $8,625.

"*A.* Nothing in the world except the statements of W. K. Kellogg in his letters. That was a thorough guaranty. I refer to the letter of September 27 and October 1, 1906."

Facts admittedly established by the testimony are: The Sanitas Nut Food Company, Limited, of Battle Creek, Mich., manufactured a large number of food preparations and was practically owned by Dr. John H. Kellogg, who held all but two shares of its stock. The defendant Will K. Kellogg was its manager under an agreement, by the terms of which he received one-fourth of the net profits. One of the food preparations manufactured by this company was Corn Flakes, a business which was afterwards, and prior to the year 1905, taken over by a corporation called in the record the Corn Flake Company. Among other foods manufactured by this company were products known as Pan-Peptogen, Maltol, and Peptol; the latter product being put on the market under that name some time during the year 1905. Mr. Charles D. Bolin, of St. Louis, Mo., was to some extent acquainted with all the foods that were made by the Sanitas Company and was a stockholder in the Corn Flake Company. He and W. K. Kellogg had been acquainted for a number of years. These two gentlemen had some talk, and later some negotiations, concerning the organization of a separate company to manufacture and develop the sale of the

other products above named. These began late in 1905, or early in 1906. Both were parties to the negotiations with Dr. Kellogg, having for their purpose the securing of an option for the formulas and the right to manufacture and sell the said products. On or about October 5, 1906, an agreement in writing was entered into between the Sanitas Company and Dr. John H. Kellogg, parties of the first part, and Will K. Kellogg, party of the second part, by the terms of which, and for the sum of $20,000, there were purchased and sold the formulas, secret processes, trade-marks, and good will attached to the aforesaid foods. The corporation, named the Peptol Company, was organized under the provisions of Act No. 232, Pub. Acts 1903, of Michigan, with a capital of $100,000, divided into 10,000 shares for the purpose of manufacturing and selling proprietary foods; the articles of association being acknowledged October 22, 1906, and the incorporators being Bernard J. Onen, Vera Sloan, and Eric E. Covert, of Battle Creek, who subscribed in all for 5,000 shares of the stock. To this company, on November 1, 1906, Will K. Kellogg assigned all of his right, title, and interest in and to the contract which has been mentioned. Mr. Charles D. Bolin undertook to interest one or more parties in the corporation about to be organized. He did interest, among others, the plaintiff, who subscribed and paid for stock to the amount of $8,625. Plaintiff also received as a bonus—that is to say, he did not pay for—300 shares of the stock. Defendant Will K. Kellogg, Bolin, and a man named Clague received, without payment of money therefor, shares of stock in the new company. The letters set out in the declaration were written by defendant Will K. Kellogg. The statement concerning earnings, appearing in the letter of September 27, 1906, was untrue. The principal issues of fact left to be determined by the jury were whether this statement was, as claimed, inadvertently written, whether it was written to be shown to or read by the plaintiff and others to whom it was desired to sell stock, whether it was shown to or read by plaintiff, and

whether plaintiff had before seeing or reading it definitely concluded to take stock in the proposed new corporation. Upon each of these there was conflicting testimony.

The jury was instructed, generally, that plaintiff, in order to recover, must establish:

"(1) That the false representation was made by the defendant relative to a material fact; and in that connection I say to you that a representation as to the earning capacity of the Peptol proposition, viz., that it earned 12 to 15 per cent. on $100,000, would be a material representation.

"(2) He must show that the false statement was made knowingly or in reckless disregard of the truth by the defendant.

"(3) That it was made with intent to deceive the plaintiff, or a class of people to whom the plaintiff belonged, and to induce the purchase of stock in the Peptol Company.

"(4) That the plaintiff relied upon and has been deceived and defrauded by such misrepresentation, and not having knowledge of its falsity or such knowledge as would put a reasonably careful person upon his guard relative to that matter."

They were further instructed that if these facts were established the measure of plaintiff's damages would be—

"The difference between what the plaintiff's investment in Peptol stock, viz., $8,625, actually was worth, and what the value would have been had these representations upon which the plaintiff claims to have relied been true; but, in determining what the value of this Peptol stock would have been had these representations been true, for the purpose of this suit you cannot find its value to exceed the amount paid by the plaintiff, viz., $8,625, because there is no proof in this case which would make the stock of greater value than this amount. With this limitation in mind, you should determine what the value of the stock purchased by Mr. Steele, which was of the par value of $11,630, was at the time he bought the stock in the Peptol Company; and the difference between this and what would have been the value of this stock had the representations been true as established by the evidence in this case (and this I have said cannot exceed $8,625, the amount paid by the plaintiff), plus simple interest at the rate of 5 per cent. per annum on this difference from

the date of November 5, 1905, would be the measure of the plaintiff's damages. I realize the fact, gentlemen, that this statement is somewhat involved. I am unable to make it plainer; but, perhaps to repeat, it is true that if the plaintiff has any right to recover at all in this case you should determine on the one hand what his holdings would have been worth if the representations made by Mr. Kellogg upon which the plaintiff relied were true; in other words, you should determine what the $11,630 par value of this stock would have been worth if Mr. Kellogg's representations had been true, but you cannot fix that value in excess of the amount the plaintiff paid for it, because there is no testimony in the case which will justify such a finding. So the greatest amount which you can find to be the value of the stock he purchased, in the event that the representations had been true, would be $8,625. But you may find it under the evidence to be less than that. If you do, you should subtract from the amount that the stock would have been actually worth had the representations been true (not to exceed $8,625), you should subtract from that what you find his stock was worth at the time he purchased it and the difference with 5 per cent. simple interest per annum would be the measure of his recovery."

With this statement we proceed to notice some of the alleged errors. We have already disposed of many of the contentions of defendant in saying that upon each of the issues above referred to the testimony was conflicting. We are satisfied that none of them should have been decided by the court. As to others, we follow, substantially, the order in which they are presented in argument.

1. In the opening statement made by the attorney for plaintiff, he said:

"We will show by Mr. Bolin that in this conversation with the Doctor which occurred in the month of July or August, 1906, the Doctor made a statement in reference to what Peptol had already been doing in the way of making money and earning money, and the Doctor stated to Mr. Bolin at that time, as I recollect, that Peptol was already earning something like $15,000 a year."

Here an objection was interposed, the substance of it being that, as Dr. Kellogg was not a party (plaintiff hav-

ing voluntarily elected to proceed upon the last two counts of the declaration), any representation made by him was not binding on Will K. Kellogg. The court permitted the statement to proceed, and the attorney for plaintiff, continuing, said:

" In that conversation Dr. Kellogg said many things in reference to what Peptol had been doing, and said to Mr. Bolin that Peptol was already earning in the neighborhood of $15,000 a year for the sale of Peptol as it had been previously carried on by the Sanitarium. Mr. Bolin made inquiry of Dr. Kellogg why he was so anxious to sell if it was earning so much money, and the Doctor said it was a preparation that was claimed to make thin people fat, and he wanted to get out of that kind of business because it was hurting his standing with the medical profession, and his influence and standing at the Sanitarium."

Plaintiff was the first witness called, and he was asked:

"*Q.* Now, in the fore part of September, 1906, did Mr. Bolin repeat to you anything that W. K. Kellogg or Dr. Kellogg had stated about the Peptol matter?
"*A.* Yes, sir."

An objection was interposed to the effect that any representation made by Dr. Kellogg was hearsay and immaterial, and the court sustained the objection. Later, on cross-examination of Bolin by defendant, he stated that Dr. Kellogg had intimated to him that Peptol was making good money and was doing well, and that he (Bolin) had informed plaintiff that the Doctor had told him it was earning $15,000 to $20,000 a year. No objection was interposed and no motion made to strike out the testimony. It was not competent, for the purpose of connecting Will K. Kellogg, to prove representations made by Dr. Kellogg. And there was, apparently, no excuse for referring to any such representations in the opening statement of counsel. But in view of the cross-examination of Bolin, which was conducted to sustain a theory of defense to the action, it would manifestly be improper to reverse the judgment because of the opening statement of counsel.

2. It is urged that testimony of oral representations

made by Will K. Kellogg to Bolin, although alleged as ground of recovery, could not furnish a proper basis of recovery because:

(1) They concerned the credit and financial standing of a business owned by Dr. Kellogg, or by the Sanitas Nut Food Company.

(2) They were not relied upon by plaintiff.

Motion to strike out the testimony was denied. In this connection may be considered the objection that statements made prior to September 27, 1906, by Bolin to plaintiff concerning the earnings of the business, were not admissible because it was not made to appear that Will K. Kellogg was responsible for such statements. A motion to strike out this last-mentioned testimony was denied upon the promise of counsel for plaintiff to prove that Will K. Kellogg was responsible for these statements, a promise which it is said was not redeemed. The record discloses that Mr. Bolin was a witness without whose testimony the plaintiff must have failed in the suit. It is his testimony which is relied upon to prove that the letter of September 27, 1906, was written to himself for the express purpose of being shown and read to possible purchasers of stock to induce them to become purchasers; that it was a cunning device to attract any one by whom it should be read. Without his testimony the letter is, for the purposes of the plaintiff, an innocent document. While Bolin's complicity in the scheme, if there was a scheme, does not relieve the defendant, it is nevertheless apparent that in permitting plaintiff to detail oral representations made to him by Bolin, and in permitting Bolin to detail oral representations made to him by Will K. Kellogg, opportunity was afforded to Bolin to exculpate himself, if he was not an innocent agent. It seems to us now, after the trial, that if the plaintiff had been required to rely upon the letter, which he says determined his action, upon the falsity of the representation therein contained and upon the testimony of Bolin to the effect that the letter was written for the purpose of inducing purchases of

the stock and was exhibited for that purpose, the real case for plaintiff would have been better presented. But it was the theory of the defendant that the letter was not written with a fraudulent purpose and was not in fact relied upon by plaintiff, and that what plaintiff did rely upon was oral representations made to him by Bolin and Clague before the letter was written. Proof of oral representations similar in character to those stated in the letter, made by Kellogg to Bolin, or to others, would have probative value in determining whether the statement in the letter was knowingly and fraudulently made. So all testimony which tended to prove that Bolin knew that the statement in the letter was untrue also tends to prove that there was no reason for repeating the statement to him in correspondence and supports in some degree the inference that the letter was designed to be shown to others. The objection that Will K. Kellogg was not connected substantially with the oral statements claimed to have been made by Bolin to plaintiff is not sustained by the record. Whether or not, · if they were made, they were relied upon by plaintiff, they were confirmed, in substance, by the letter of September 27th. The legal objection which was made is without merit because it is clear that Will K. Kellogg was to profit out of the contemplated venture.

3. The letter of October 1st was properly admitted in evidence, since it tended to negative inadvertence or mistake in making the representation contained in the letter of September 27th.

4. The witness Bolin, over the objection that he was not qualified to do so, was permitted to testify to the value of plaintiff's stock at the time it was purchased. This ruling is assigned as error. He gave an opinion because no one could do more than that. Defendant also gave his opinion; no objection being made. The value of the opinions was for the jury. The stock had no market value. It was not the subject of sale. No error was committed.

5. Whether plaintiff had agreed with Bolin or Clague or either of them to take stock in the corporation before he read the letter of September 27, 1906, was material, and it was material, also, whether defendant believed or understood that he had done so at the time the said letter was written and sent out. Correspondence relating to the attitude of plaintiff passed between Kellogg, Bolin, and Clague. It is not claimed that anything in this correspondence was brought to the attention of plaintiff; but as affecting the credibility of Bolin, who testified that no agreement to take stock had been reached before September 27th, and that plaintiff finally concluded to take stock October 30th, some of the correspondence was supposed to be material.

One of the letters excluded was written September 23, 1906, by Clague to Bolin, and was answered by Bolin under date September 29th. Confronted with the Clague letter and his reply thereto, Bolin was permitted to tell what he meant by language employed in his letter. It is said this was error. It will be remembered that when these letters were written no arrangement had been concluded with the Sanitas Nut Food Company, or with Dr. Kellogg. A proposition that Clague, Bolin, and defendant should each give to plaintiff $1,000 par value of stock proposed to be taken by them in the new company had been agreed to by Bolin and Clague but not by defendant. In his letter of September 23d Clague appears to charge the blame for nonconclusion of the principal arrangement to Bolin, who replied (September 29th):

"I cannot agree with you that I am holding up the Peptol proposition; the situation is just like it was when you left St. Louis. I told you when you were here that in order to get Mr. Steele in we would have to give him $8,000 worth of stock for $5,000. You and I agreed to give him $1,000 of our stock and leaving the other $1,000 for Mr. Kellogg to give. We then told Mr. Steele what we would do and he accepted our terms. That left the proposition up to Mr. Kellogg. Now he refuses to accept our terms and the Doctor has raised the price from

$18,000 to $20,000. I suppose if the matter drags a little longer they will raise it to $50,000. Allow me to say that I am not going to make any more concessions; if they want the deal closed on the terms already agreed upon between you and I and Doctor Kellogg's last proposition to sell for $20,000 and take our note for $6,500 we will accept the proposition, if not, so far as I am concerned, you can count me down and out. I note further that you state that Peptol is a good proposition; if I did not think so, I would not of course, gone into it. But I cannot afford to give my time to selling the stock and promoting the company unless I am well compensated. I have written Mr. Kellogg a letter plainly stating that the proposition was up to him and unless he accepted it as proposed, that we would drop further negotiations. I appreciate the fact that you were willing to sacrifice part of your interest to close the deal and as you know I was willing to do the same thing. I think the Kelloggs are making a good thing out of the deal; they know about what they are doing or they would not sell. I have told Mr. Kellogg all along that I would not go into the deal unless Mr. Steele went into the proposition with me. We always make investments of all kinds together and I regard his judgment in these matters as first class and he would make one of the best directors we would have in the company. Unless Mr. Kellogg accepts this proposition by Tuesday and not later than Wednesday the whole deal will be a closed incident so far as I am concerned, as Mr. Steele has already notified me that he has other matters pending which he wants to close and that I must give him an immediate answer.   *   *   *

"P. S. I really feel Mr. Kellogg and Dr. J. H. Kellogg should let this deal be consummated as agreed by you and I with Mr. Steele. We made a definite agreement with him and it is not in good faith for us to break our agreement with him. What shall I say to him? I cannot afford to put myself in such a position again with him, he would lose faith in me and he would have a good reason for so doing."

On September 29, 1906, Bolin also wrote to defendant, and in the letter he says:

"I have a letter from Mr. Clague this morning in which he intimates that I am holding up the deal. I am sorry that he looks on the matter in that light as I am do-

ing nothing of the kind. It is up to Mr. W. K. Kellogg to accept the terms which Mr. Clague himself agreed to while in St. Louis."

In a postscript the following is added:

"Mr. Clague and I felt sure you would do this and so agreed with Mr. Steele and immediately notified you, or at least Clague said he would. Your refusal to accede to our agreement puts us in an uncomfortable position with Mr. Steele. We definitely agreed to accept his proposition and I am at a loss to know what to say to him. I have made one or two trips to try and close this deal. After all our trouble with the Doctor it falls through for a pittance."

His explanation of this postscript is that he meant by the words "and so agreed with Mr. Steele" that he had agreed in a tentative way and had in fact only a conditional understanding with plaintiff, who was demanding "something more definite." Whatever one may think of the explanation made by this witness, we know of no rule of evidence which refuses a witness the right to explain what he has written, or has stated orally, in correspondence with others. As to the excluded letter, written by Clague, nothing in it adds to or takes from the apparent force and effect of the correspondence which was received in evidence.

6. Plaintiff retains his stock in the corporation. His action is for damages for fraud and deceit. He paid $8,625 for his stock and received therefor stock of the par value of $11,630. Of this, $3,000 worth of stock, at par, was, according to his testimony and contention, bonus stock. Verdict was rendered December 18, 1908, and if the jury had found the stock to be worthless when purchased, and if they followed the instructions given them by the court, the accrued interest would have amounted to about $898. The jury in the verdict added $817.27 to the amount of the original investment. It is said that the charge permitted the jury to consider the difference between the actual value and the represented value of $11,630 of stock, and that error was thus committed. As

the court also charged the jury that if the representations had been true the stock could have no greater value than the amount paid for it, it is evident that defendant was not prejudiced. Clearly, the actual value of 1,130 shares would be greater than the actual value of 863 shares.

It is contended further that it was error to instruct the jury to add interest to the difference in value as determined by them. Compensation is what the law means to award in such a case, and although it has been sometimes said that the jury *may* add interest—that it is discretionary—the general rule appears to be that where money is obtained by fraud and deceit its recovery, with interest, is compensation. 14 Am. & Eng. Enc. Law (2d Ed.), pp. 189, 190; *Snow* v. *Nowlin*, 43 Mich. 383, 387 (5 N. W. 443).

7. The assignments of error not herein specifically referred to have been considered. We think most of the contentions made with respect to them are answered by the record and we find no occasion for discussing them. We are not convinced, in view of the nature of the controversy and of the benefit likely to be derived from seeing and hearing the witnesses, that the court below ought to have set aside the verdict as contrary to the weight of evidence.

As we are unable to say that error was committed at the trial, the judgment is affirmed.

HOOKER, MOORE, McALVAY, and BROOKE, JJ., concurred.